# SENTENCING MEMORANDUM

**Laura M. Miranda**
**Attorneys at law PLLC**

3604 Broadway
New York, NY 10031

*NYS, NYS Federal*
*1st & 3rd Cir Court of Appeals*

Telephone 212.939.9535
Facsimile 646.845.7301
Cellular 917.696.7933

August 8, 2013

Honorable Justice Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  <u>United States v. Selman Lajqi</u>
      Criminal Docket No.  11-486 (DLI)

Dear Honorable Justice Dora L. Irizarry,

I submit the following pre-sentence memorandum on behalf of my client, Selman Lajqi, who was released on a secured personal recognizance bond of $150,000 August 1, 2013.  Selman Lajqi pled guilty to Ct. 9, 18 U.S.C. sec. 1956(h) on March 13, 2013 and is currently scheduled for sentencing before Your Honor August 22, 2013 at 10am.  Pursuant to the terms of Selman Lajqi's plea agreement, the advisory guideline range is 12-18 months custody, based on total offense level 15, criminal history category I, and a 2 level reduction for a Global disposition to which the Government has agreed.

Based on Selman Lajqi's peripheral participation in the instant matter, acceptance of responsibility, remorsefulness, lack of prior criminal history, and immigration status, Selman Lajqi requests the Court impose the alternative sentence recommended by probation:

> As an alternative, pursuant to Guideline 5C1.1(d)(2), Your Honor may impose a term of imprisonment of 6 months followed  by a term of supervised release with a special condition requiring 6 month community confinement or home detention. [PSR pg. 29, paragraph 134. and page 2 of U.S. Probation Department Sentence Recommendation]

In order for Selman Lajqi to avoid deportation, however, we request the Court order mental health treatment during the term of supervised release, instead of the six (6) month community confinement or home detention.  See, USSC Guidelines Manual §§5B1.3(d)(5) and 5D1.3(d)(5);  <u>United States v. Ruff</u>, 535 F.3d 999 (9th Cir. 2008) (affirming a variance to one day of imprisonment plus three years' supervised release with a condition of twelve months and one day served at a corrections center that would permit the defendant to participate in work release, receive counseling, and make visits to his young son).

Hon. Dora L. Irizarry
Page 2
August 8, 2013

## INTRODUCTION AND BACKGROUND

Born in Kosovo, Selman Lajqi is a forty-two (42) year old Albanian immigrant, who migrated to the United States in 1992, not wanting to be a part of the military in his country and seeking to be free from the violence which took the lives of many innocent lives, he witnessed firsthand during his childhood. Raised on a farm with his mother, Zoje Hysaj, father, Uke Lajqi, and eight (8) siblings, Selman began working at an early age of 7, physical and manual labor, together with his brothers and sisters. He learned how to care for himself, the farm animals, and his siblings. He grew up in a home with a strict father who subjected his mother, himself and siblings to verbal and emotional abuse, as well as physical violence. As a result, Selman suffered from anxiety and depression at a young age. Residing in Albania during a period of extreme violence, exacerbated Selman Lajqi's mental health condition, causing Post Traumatic Stress Disorder. He continues to suffer from Anxiety, Depression, and Post Traumatic Stress Disorder, today and is on medication. [PSR p. 25, paragraph 101]. Selman's mother was also tragically killed at the age of 60, when she was on her way to care for an ill neighbor. Today Selman resides with his wife, Vicenzina ("Vicky"), of nineteen (19) years, their son, 18 year old son, and two their (2) daughters, ages 17, and 12, in Monroe, New York. Upon his release Selman Lajqi visited the Horizon Family Medical in Blooming Grove, NY, to seek mental health treatment as recommended by Probation.

## I.  Section 3553(a) Factors

A.  **Selman Lajqi's personal history and characteristics and nature and circumstances of offense (18 U.S.C. 3553(a)(1))**

   **Selman Lajqi's personal history and Characteristics**

Committed to not repeating his father's abuse, Selman Lajqi enjoys a healthy, loving family life, together with his wife, Vicky, and their three (3) children. Selman met Vicky in 1993, when his wife was taking an SAT course at Leman college in the Bronx and he was studying English. A mutual friend introduced them. They became close friends and as the year went by fell in love with each other. Selman was learning English to be able to attend college. Prior to leaving his country Selman studied biology at the University of Prishtin for one (1) year [PSR p.26, paragraph 104]. He chose to leave Kosovo because he could not conceive of killing another human being and serve in the war based on his beliefs. He escaped to Switzerland to avoid his country's mandatory military service and sought refuge in the United States of America in 1992. He was granted political asylum in the United States in 1993 and in 1998 became a Legal Permanent Resident. When Selman attempted to register to go to school in the United States he was unable to afford studies or obtain financial aid, so he continued to work odd jobs. In 1993 Selman was employed as a busboy at John Marino restaurant on 57th street in Manhattan.

Once in the United States Selman made a commitment to watch over and care for his younger brother, co-defendant, Bajram Lajqi, with whom he lived prior to marrying Vicky. Selman did this because of his love for Bajram, and also because his brother he suffered gas poisoning while at school when they were younger. As a result, Bajram had never been the same, mentally, emotionally, and physically. Selman's brother suffered from a serious heart condition. Selman cooked and cleaned for his younger brother while residing together. When he and Vicky married, at different times because Bajram was not well, 1997-2001 and 2007-2008, he lived with Selman and his wife. In addition, when they weren't living together, if Bajram was ill, he would call Selman, no matter what time of day or night. Selman would

Hon. Dora L. Irizarry
Page 3
August 8, 2013

travel to Bajram's home an hour away, take him to the hospital or bring him back to his own home and care for his brother. Feeling responsible for his well being, in 2008, after learning Bajram, suffered a heart attack, Selman had a nervous breakdown. [PSR p. 25, paragraph 100]. He was unable to work as a result of this trauma. "During a nearly two-year period of time between 2008-2009, he suffered from severe depression and his wife was the sole provider for the family." [Prob. Dept. Sentence Recommendation, p. 2]

Selman faithfully, called his mother and father weekly to see how they were doing, and let them know he was caring for Bajram. While he worked as a bus boy he would send money to his parents, and brother and sisters. Selman felt horrible when he thought about his family back home. He had food to eat and often worried about his family, knowing they didn't have much to eat because of the war in his country. He worked hard to try to help them.

In March 1994, when they learned Vicky was pregnant, Selman asked her to marry him. He did so despite his family's opposition he marry a woman not Albanian. Selman worked long hours at the restaurant and saved money for he and Vicky to marry on November 3, 1994. They had their first child, a son, in 1995, and their first daughter, in 1996. It was not an easy road the first couple of years as the majority of Vicky's family, except for her aunt, Isabel Martinez, lived in Florida, and Selman's relatives in NY turned their back on him. During that time Selman worked two (2) jobs at ShopRite in Yonkers and construction. In 1997 he obtained a job as a super, which eased the family's financial stress as they did not have to pay rent. Selman encouraged his wife, Vicky, go to school. He continued working as a super, while at night he bused and waited tables, and cared for their son and daughter in the morning. Because of his support, in 1999 Vicky was certified and able to obtain employment at St. Joseph's Hospital in Yonkers as an EEG Technologist. She continues to work in this field and has been employed ten (10) years at Good Samaritan Hospital, in Suffern, NY.

Selman has always been a committed husband, father, brother and son. His wife's family has observed Selman's hard work, support and care for his family over the years. He has also been very loving and supportive toward them, and they consider him family. While raising their children, Selman enjoyed spending time with them, playing soccer and helping them with homework. In 2000 they welcomed their third child, and second daughter. Selman and Vicky were living in Yonkers, and dreamed of buying a home for their children. They began saving while Vicky worked full time and Selman continued to be employed as a super. In addition, he worked at ShopRite and did construction on the side. Noteworthy August 2, 2010 to April 20, 2011, Mr. Lajqi was employed as a loader with UPS Freight in Montgomery, New York, earning $10.75 per hour. [PSR p. 26, paragraph 108].

After suffering an accident on the job at ShopRite, Selman won a worker's compensation case. With the proceeds and their hard earned savings, a few years after Selman and Vicky were able to purchase their home in Monroe in 2005. When Vicky's sister turned 18 she moved in with the Lajqi's. Selman was the first to open their home, loving her like his own sister and trying his best to help her. He was also loved in the community, the first to help a neighbor or friend if their home needed repair. He further encouraged Vicky twice a year to visit her family. Selman told her it was important for their children to learn about their Puerto Rican heritage and spend time with their grandparents.

Hon. Dora L. Irizarry
Page 4
August 8, 2013

While residing in Monroe, their children played sports and excelled in school. Their son joined the basketball team and played from fifth grade through high school. He received recognition from Who's Who for scoring high on the NYS Global test and received the 100 Global History Regents June 2011 award. Both their daughters play soccer, and the youngest one was accepted to varsity last year for volleyball. Their son joined catholic charities in 2012 to help feed the poor at a pantry which Selman and Vicky encouraged. He was recently accepted at St. John's University and received a scholarship of approximately $24,000 toward four (4) years of college while maintaining a required GPA.

Selman and his family have been supportive, active members of Grace Community Church in Washingtonville, New York, over the past decade. During Selman's incarceration, Vicky continued volunteering at the church.

### B.  Sentencing Factors Warrant a Variance of Downward Departure

A sentencing court may deviate from the Sentencing Guidelines pursuant to U.S. Supreme Court's decision U.S. v. Booker, 543 U.S. 220, 226, 125 S.Ct 738 (2005). Mandatory application of the Sentencing Guidelines is no longer permitted based on its incompatibility with the Sixth Amendment. Discretionary power was restored to the judiciary. The three-step process set forth in Gall v. U.S., 128 S.Ct 586 (2007) offers clear guidance to determine an appropriate sentence. The sentencing court must first determine the guideline range. Next, inquire if any of the guideline's departure policy statements apply in order to adjust the guideline range. Finally, all factors set forth in 18 U.S.C. § 3553(a) must be considered, including whether a sentence outside the advisory guideline system --- is warranted. Gall v. U.S., 128 S.Ct 586 (2007); U.S. v. Booker, 543 U.S. 220 (2005); U.S. v. Crosby, 397 F.3d 103 (2d Cir. 2005). Consequently, the law is unequivocal, "[a] district court may not presume that a Guideline sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by arguments of the prosecutor and defense." U.S. v. Cavera, 550 F.3d 180, 189 (2nd Cir 2008)

### C.  Avoiding unwarranted disparity (18 U.S.C. §3553(a)(6))

Pursuant to section 3553(a)(6) a sentencing court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The Court was unequivocal in *Gall,* considering disparity between similarly situated co-defendants appropriate at sentencing. See, *Gall*, 128 S.Ct. at 600 (where district court "considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"). *See United States v. Smart,* 518 F.3d 800, 804-05 (10th Cir. 2008) (finding no procedural error in considering co-defendant disparity and affirming variance where defendant's sentence was reduced so that it was not disproportionate to the more culpable offender); *United States v. Presley*, 547 F.3d 625, 631-31 (6th Cir. 2008) (held sentencing court did not abuse discretion considering co-defendant's sentence as justification for a downward variance).

Hon. Dora L. Irizarry
Page 5
August 8, 2013

The Court has sentenced a number of co-defendants involved in money laundering and drug conspiracy. Selman Lajqi differs from the codefendants and the typical money launderer. He did not depend upon criminal activity for his livelihood. In fact, he had no prior incidents with the law. Selman Lajqi was a Legal Permanent resident, and had been granted political asylum. He was employed as a loader with UPS Freight in Montgomery, New York, and did construction on the side. He also worked as a laborer at City Line Water & Sewer in the Bronx. Selman has a lengthy work history, including as a construction laborer, a waiter, and a superintendent. Finally, given the lack of any commensurate profit by Selman Lajqi in comparison to co-defendants, who relied upon the money laundering and drug conspiracy for there livelihood, no disparity would existe if this Court should "vary" from the Guidelines.

## II. Reasons to Vary From the Sentencing Guidelines

### A.  Selman Lajqi's Participation

Selman was arrested at his home on July 13, 2011. Unfortunately, his three (3) children, wife, Vicky, his sister in law, Alexandria, and her child, were all present. Selman was naked when the officers removed him from his bedroom. He only flailed his arms to cover his private parts and otherwise, fully cooperated with the officers. [PSR p. 13, paragraph 41]. Selman's participation was limited to assisting his brother, Bajram. As probation accurately states, Selman,

> [W]as never a fully trusted member of the drug conspiracy. Selman Lajqi completed errands on behalf of Bajram Lajqi, including storing drug money at his house and transporting cash to Thaqi and others, representing Bajram Laqi's payments for drugs. Selman Lajqi was fully aware of the nature of his errands and the scope of his brother's business, **but he completed no other duties.** [PSR p. 13, paragraph 41.] (emphasis added).

Selman Lajqi has demonstrated he is a hard working family man, who exercised a lack of judgment, completely out of character for him. He poses absolutely no threat to the community and at no time did he engage in any violent behavior.

### B.  Selman Lajqi's role as a committed parent in raising his three children

Selman Lajqi and his wife, Vicky, have shared responsibility in raising their three (3) children. The only time Selman has been separated from his family was over the past two (2) years while incarcerated. Where an offender has young children, courts have considered this fact and "varied" downward. *See, e.g., United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008); *United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008). If Selman Lajqi were deported there would be a substantial emotional price to be paid by his children, losing their daily companionship long term. Their separation from him has already been detrimental to them over the last two (2) years. In addition, the absence of their father's financial and emotional support, considering he will be outside of the country, and they will be unable to afford to see him, solely depending on their mother. Such would be devastating to the children and their future as functioning members of society. They have been accustomed their entire life to be raised by their father, as he spent a substantial amount of time with them during the day when he worked as a super.

Hon. Dora L. Irizarry
Page 6
August 8, 2013

### C. Selman Lajqi's mental and physical health

Mental and physical conditions are relevant in determining a departure in Selman Lajqi's case, as such conditions are present to an unusual degree.  Selman Lajqi was raised in a home where his father was abusive, emotionally and mentally as well as physically violent to his mother, siblings and himself.  Growing up in Kosovo, he also witnessed horrific events [PSR p. 25, paragraph 98],
including women and children his own age being killed, and his brother, Bajram, as well as classmates he had grown up with, poisoned by nerve gas.  Many of whom Selman observed remained in a coma, or never recovered to be the brother and friends he cared about.  As a result, Salman Lajqi suffers from Anxiety, Depression & Post-Traumatic Stress Disorder.   Additionally, during his incarceration in 2012 Selman had a seizure, and was on 300 milligrams of gabapentin to treat them. [PSR p. 25, paragraph 99].  Furthermore, Selman suffers from back pain resulting from a fall while working as a porter.  [PSR p. 25, paragraph 98] .

Probation concluded, Selman being subject to, and witness, of such violence, was responsible for his mental health condition, "In part, as a result of being raised in Kosovo during the Yugoslavia wars, he was diagnosed with anxiety, depression and post-traumatic stress disorder." [Probation Dept. Sentence Recommendation, p. 1]   We, therefore, assert Selman Laqi's mental health further impaired his judgment leading to the instant offense.

### D. Selman Lajqi's Immigration Status as a Political Asylee and a Permanent Legal Resident

Although §5H.10 specifies national origin irrelevant in determining a sentence, Selman Lajqi's immigration status is a factoring warranting a downward departure or a variance due to the harsh consequences resulting from mandatory deportation of non-citizens convicted of certain crimes.  U.S.C. § 1227.  In addition to criminal convictions barring non citizens from certain forms of relief from removal, pursuant to immigration rules, the length of a sentence may have the same impact.  Among the several aggravated felonies listed under 8 U.S.C. §1101(a)(43), money laundering under §1956 is one of them. 8 U.S.C. §1101(a)(43)(D), see also INA 101(a)(43)(D).  The specified amount must exceed $10,000 in order for the conviction to be applicable under §1101(a)(43).  According to the plea agreement entered on March 12, 2013, the amount of monies Selman Lajqi pled  to were valued at more than $5,000 but less than $10,000.  As such, this money laundering conviction is not an aggravated felony under 8 U.S.C. (a)(43)(D).

Selman Lajqi's money laundering conviction, however, may be considered a crime of moral turpitude subjecting him to removal.   Such a crime is "conduct that shocks the public conscience as being inherently base, vile, or depraved and contrary to the accepted rules of morality and the duties owed between persons or to society in general."  Ebrahim v. Leconey (W.D.N.Y. 12-11-12) at 32.  A non-citizen, like Selman Lajqi, is subject to mandatory deportation if "convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and its convicted of a crime for which a sentence **of one year or longer may be imposed**."  8 U.S.C. § 1227 (a)(2)(I) (emphasis added).

The Board of Immigration  Appeals has found money laundering pursuant to 18 U.S.C. § 1956, the count Selman Lajqi pled guilty to, a crime involving moral turpitude.  Smalley v. Ashcroft, 354 F.3d 332 (5th

Hon. Dora L. Irizarry
Page 7
August 8, 2013

Cir. 2003); Matter of Silva-Trevino, 24 I&N Dec. 687, 710 (A.G. 2008) citing Matter of Tejwani, 24 I&N Dec. 97, 98 (BIA 2007) (money laundering conviction treated as a crime involving moral turpitude as the statute "required both that the perpetrator knew the money in issue represented the proceeds of criminal conduct and that the person intentionally exchanged or handled the money "to conceal or disguise" its criminal origins.)  Thus, Selman Lajqi requests the Court consider the consequence of deportation in support of a downward variance, which would constitute a much harsher sentence not envisioned by the sentencing guidelines.  We request the Court sentence Selman Lajqi, accordingly.

## Conclusion

Selman Lajqi was in custody since his arrest on July 13, 2011, until released August 1, 2013, a total of 24 months and twenty (20) days.  Twenty-four (24) months alone was characterized by the U.S. Department of Probation as "above the high end of the guideline range," and "meeting the need for punishment and deterrence" and recommending "a sentence of Time Served"  [PSR p. 29, paragraph 134.]   Due to the severe consequence he faces of deportation, which was not considered in Probation's recommendation, Selman Lajqi respectfully requests the alternative prison sentence recommended by probation, of "6 months followed by a term of supervised release with a special condition requiring 6 months community confinement or home detention." But instead of six (6) months community confinement or home detention, we beg the Court order Selman Lajqi continue mental health treatment.  United States v. Meyers, 503 F.3d 676 (8th Cir. 2007) ("district court did not abuse its discretion in finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence; United States v. Grossman, 513 F.3d 592 (6th Cir. 2008) (affirming a downward variance from 120 months in prison to 66 months with 10 years supervised release, and observing that the sentencing court "accounted for § 3553(a)'s concerns that the sentence protect society and deter future criminal conduct," but that "it opted to pursue those goals, not through a longer term of imprisonment, but through extensive counseling and treatment and an extensive period of supervised release").  As in the instant case, a court also has the authority to depart applicable guideline range if it finds an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that . . . should result in a sentence different from that described." As discussed in Chapter 1, Part A of the Guidelines Manual:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

We request the Court sentence Selman Lajqi, accordingly.

Respectfully submitted,

_____/s/_____
Laura M. Miranda (7909)

cc: AUSA Steven Tiscione